**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**OLOF FRANZON, M.D. and WOMEN'S**
**MEDICAL & SURGICAL HEALTH**                    **7:97-CV-150**
**CARE, P.C.,**                                             **(GLS/RFT)**

     *Plaintiffs,*

     **v.**

**MASSENA MEMORIAL HOSPITAL;**
**BOARD OF MANAGERS OF MASSENA**
**MEMORIAL HOSPITAL HOSPITAL;**
**MEDICAL EXECUTIVE COMMITTEE OF**
**MASSENA MEMORIAL HOSPITAL; JAYANT**
**J. JHAVERI, M.D.; JAMES B. WATSON;**
**CHRISTINE ROWE-BUTTON, M.D.;**
**SATEESH K. GOSWAMI, M.D.; MELCHIORE**
**L. BUSCEMI, M.C.; EDWARD BURKE, M.D.;**
**KENNETH MAXIK, M.D.; TAE-SIK CHOI, M.D.;**
**LOIS NICANDRI; and TINA CORCORAN,**

     *Defendants.*
_____

**APPEARANCES:**                            **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

FISCHER & MANDELL, LLP            MITCHELL G. MANDELL, ESQ.
546 Fifth Avenue
15th Floor
New York, New York 10036

**FOR THE DEFENDANTS:**

**For Massena Memorial Hospital,
Board of Managers of Massena
Memorial Hospital, Medical Executive
Committee of Massena Memorial
Hospital, James B. Watson, Melchiore
Buscemi, MD, Kenneth Maxik,
Tai-Sik Choi, MD, Lois Nicandri and
Tina Corcoran:**

THUILLEZ, FORD LAW FIRM          DONALD P. FORD, JR., ESQ.
20 Corporate Woods Boulevard
6th Floor
Albany, New York 12211-1715

**For Jayant J. Jhaveri, M.D.:**

D'AGOSTINO, KRACKELER          CHRISTINE K. KRACKELER,
LAW FIRM                       ESQ.
16 Sage Estate
Sage Mansion
Menands, New York 12204

**For Christine Rowe-Button, M.D.:**

DONOHUE, SABO LAW FIRM          ALVIN O. SABO, ESQ.
P.O. Box 15056
24 Aviation Road
Albany, New York 12212-5056

**For Sateesh K. Goswami, M.D.:**

SMITH, SOVIK LAW FIRM          JAMES D. LANTIER, ESQ.
250 South Clinton Street
Suite 600
Syracuse, New York 13202-1252

**For Edward Burke, M.D.:**

2

O'CONNOR, O'CONNOR LAW FIRM     TERENCE P. O'CONNOR, ESQ.

20 Corporate Woods Boulevard
Albany, New York 12211

**Gary L. Sharpe**
**U.S. District Judge**

## <u>MEMORANDUM-DECISION AND ORDER</u>

### I. <u>Introduction</u>

Olof Franzon alleges, pursuant to 42 U.S.C. § 1983, that defendants violated his First Amendment rights when they refused to renew his hospital privileges after he publicly criticized hospital policies.  This ten-year old litigation has been the subject of several prior Memorandum-Decision and Orders.  *See e.g., Franzon v. Massena Memorial Hospital*, 89 F. Supp. 2d 270 (N.D.N.Y. 2000) (dismissing Franzon's claims for defamation and tortious interference with business relations against defendant Choi); *Franzon v. Massena Memorial Hospital*, 189 F.R.D. 220 (N.D.N.Y. 1999) (declining to reconsider a prior decision that denied defendants' assertion of privilege over discovery materials used in the hospital's peer review process); *Franzon v. Massena Memorial Hospital,* 32 F. Supp. 2d 528 (N.D.N.Y. 1998) (reviewing and partly modifying prior discovery orders);

3

*Franzon v. Massena Memorial Hospital*, 977 F. Supp. 160 (N.D.N.Y. 1997) (dismissing Franzon's Equal Protection claim against all defendants and Franzon's First Amendment retaliation claim against defendants Kenneth Maxik and Tae-Sik Choi).[1]

After defendants filed individual motions for summary judgment and an appeal of a magistrate decision, *see Dkt. Nos. 545, 551, 559, 571, 578, 587, 593, 621, 629, 638*, the court held a hearing on November 18, 2004. At that hearing, the parties presented oral arguments, and the court delivered a partial oral ruling. *See Dkt. No. 656.* The court's oral ruling effectively denied the appeal of the magistrate judge's decision and dismissed causes of action two, three, and four pursuant to Franzon's oral concessions. *See id.* The court reserved decision on the remaining claims in Franzon's amended complaint and granted the parties additional time to supplement the record. *See id.* On November 24, the court dismissed the

---

[1]The disposition in *Franzon v. Massena Memorial Hospital*, 977 F. Supp. 160 (N.D.N.Y. 1997) (McAvoy, J.), was docketed and ordered on August 8, 1997. *See Dkt. No. 16.* On October 10, 1997, Franzon filed an amended complaint, reasserting the following six claims: (1) retaliation for Franzon's exercise of his First Amendment rights, (2) intentional and malicious conduct warranting punitive damages, (3) attorneys' fees pursuant to 42 U.S.C. § 1983, (4) defamation, (5) tortious interference with business relations, and (6) tortious interference with a contract. *See Dkt. No. 24.* The court considered the amended complaint the operative complaint when it held oral arguments on November 24, 2004. *See Dkt No. 658.*

fourth, fifth, and sixth causes of action.[2]  *See Dkt. No. 658.*

On January 1, 2005, Franzon filed a voluminous supplemental Statement of Material Facts.  *See Dkt. Nos. 671, 672, 673, 674.* Defendants Jhaveri and Goswami have moved to strike these filings, *see Dkt. Nos. 677, 679*, because they fail to comply with Local Rule 7.1.

As such, the current status of this litigation is the following.  Still pending are defendants' motions for summary judgment insofar as they seek to dismiss Franzon's First Amendment claim and dispose of this lawsuit in its entirety.  In addition, the court will also address the additional filings, including Franzon's supplemental Statement of Material Facts and those motions seeking to strike it from the record.

For the reasons that follow, the motions for summary judgment on behalf of defendants MMH, MMH Board of Managers, MMH Executive Committee, Dr. Melchiore Buscemi, James B. Watson, Dr. Jhaveri, and Dr. Burke are denied insofar as they address Franzon's First Amendment

---

[2]In accordance with the court's November 24, 2004 oral ruling, the first cause of action in the amended complaint (which asserts claims for retaliation and conspiracy to retaliate against Franzon for exercising his First Amendment Rights) is the only claim still pending against the following defendants: Massena Memorial Hospital, Board of Managers of Massena Memorial Hospital, Medical Executive Committee of Massena Memorial Hospital, Dr. Jayant J. Jhaveri, James Watson, Dr. Christine Rowe-Button, Dr. Sateesh K. Goswami, Dr. Melchiore L. Buscemi, Dr. Edward Burke, Kenneth Maxik, Dr. Tae-Sik Choi, Lois Nicandri, and Tina Corcoran.  *See Dkt. Nos. 24, 656.*

claim; the motions for summary judgment on behalf of defendants Lois
Nicandri, Dr. Rowe-Button, Dr. Goswami, Tina Corcoran, Dr. Choi, and
Kenneth Maxik are granted; and the motions to strike are granted in part
and denied in part.

## II. Facts

### A.    The Parties

Olof Franzon is a licensed physician in the State of New York and a
board certified obstetrician/gynecologist.  *See MMH[3] SMF ¶4; Dkt. No. 569.*
Dr. Franzon was the sole stockholder in Women's Medical and Surgical
Health Care, P.C.  *See id.* at *¶5; see also Rowe-Button SMF ¶3; Dkt. No.
555.*  From March 1 through August 1998, Dr. Burke was the Medical
Director of Massena Medical Hospital (MMH).  *See Burke SMF ¶1; Dkt. No.
622.*  As Medical Director, he was a non-voting member of all hospital
committees and a voting member on the Credentials Committee.  *See id.*
At all relevant times, Dr. Rowe-Button was the Chief of Radiology and a
member of the Medical Executive Committee[4] at MMH.  *See Rowe-Button
SMF ¶4; Dkt. No. 555.*  From June 14, 1995 to December 17, 1999,

_____

[3]The court will refer to Massena Memorial Hospital as MMH.

[4]The Medical Executive Committee is the executive committee of the medical staff and
consists of the Chief of Staff, the Chiefs of Medicine, Surgery, Radiology, Pathology,
Emergency Service, and the former Chief of Staff.  *See Rowe-Button SMF ¶5; Dkt. No. 555.*

Kenneth Maxik was employed as the Senior Director of Administrative Services at MMH.  *See Maxik SMF ¶1; Dkt. No. 583.*  As Senior Director of Administrative Services, Maxik attended the open sessions of the Board of Managers at MMH.  *See id. at ¶2.*  Dr. Choi is a Board Certified obstetrician/ gynecologist with hospital privileges at MMH.  *See Choi SMF ¶5; Dkt. No. 589.*  Dr. Choi was not a participating member of any hospital committee concerned with the credentialing of Dr. Franzon.  *See id.*  From 1994-1997, Mr. James Watson was the Chief Executive Officer of MMH.  *See Watson SMF ¶1; Dkt. No. 574.*  Christine Corcoran has been the Director of Public Relations at MMH since August, 1990.  *See Corcoran SMF ¶1; Dkt. No. 594.*  She attends open sessions of the Board of Managers, but she was not a member of any hospital board or committee dealing with Dr. Franzon's credentials.  *See id.* at *¶¶2, 6.*  At all relevant times, Lois Nicandri was a member of the Community Relations Committee that allocated monies to MMH for advertising.  *See MMH SMF ¶115; Dkt. No. 569.*  At all relevant times, Melchiore Buscemi was a member of the Medical Executive Committee.  *See id.* at *¶110.*

**B.** **MMH, MMH Board of Managers, and MMH Executive Committee**

In January 1993, Dr. Franzon was granted unrestricted privileges to

practice at MMH.  *See MMH SMF ¶45; Dkt. No. 569.*  Initial appointments

granting medical privileges at MMH are for a six month period, and

reappointments are for a maximum of two years.  *See id.* at  *¶70.*

Beginning in September 1995, Dr. Franzon openly advocated for the

addition of nurse-midwifery to those services offered by MMH.  *See id.* at

*¶45.*  Dr. Franzon also openly spoke about MMH quality of care issues,

billing practices, and the anesthesiology department.  *See id.* at  *¶¶59-67.*

In November 1995, and after publicly advocating nurse midwifery, Dr.

Franzon applied to renew his hospital privileges at MMH.  *See MMH SMF*

*¶46; Dkt. No. 569.*  As part of that application, he applied for privileges to

supervise Certified Registered Nurse Anesthetists ("CRNAs"). *See id.*

Although Dr. Franzon stated in an open meeting of the Board of Managers

that he signed the application to supervise CRNAs because "that is the only

way we can work here," he claimed two days later that he was not qualified

to supervise CRNAs.  *See id.* at  *¶¶48, 49.*

Based on Dr. Franzon's initial willingness to supervise CRNAs,

Watson wrote Dr. Franzon, asking him to accept the responsibility of

supervising CRNAs.  *See MMH SMF ¶50; Dkt. No. 569.*  Dr. Franzon

signed the Watson letter, dated February 26, 1996, acknowledging his

current competence and accepting responsibility to supervise CRNAs. *See*

*id.* at ¶*51.* Franzon's handwritten statement on the returned

acknowledgment specifically stated,

> I am as qualified as any other surgeon in this hospital to supervise
> CRNAs, possibly more so, considering two months of anesthesia
> training during my residency. I can tell you people right now that I nor
> anyone else of the surgeons know how to deal with anesthetic
> complications. A letter will follow to clarify my statement.

*Id.* On March 8, Dr. Franzon wrote to Watson a second time, stating in

pertinent part:

> You requested or more accurately coerced me to sign a letter
> where I admit to be 'currently competent to supervise CRNAs'
> and also that I take the responsibility for this supervision
> CRNAs. [sic] In my opinion, all surgeons, unless they spend at
> least one month a year working with an anesthesiologist, are
> inadequately trained to supervise a nurse anesthetist.

*Id.* at ¶*52.* This letter was also sent to Dr. Schwam, Chief of

Anesthesiology. *See id.* Consequently, Dr. Schwam communicated his

desire to withdraw his prior recommendation for approval of Franzon's

application to supervise CRNAs. *See MMH SMF ¶54; Dkt. No. 569.*

On March 18, 1996, the MMH Board of Managers renewed Franzon's

hospital privileges for a six month period. *See id.* at ¶*57.* However, the

Board denied Franzon's request to supervise CRNAs. *See id.* By letter,

the Board notified Franzon of its decision, stating in part:

9

Dr. Franzon's request to supervise...CRNAs is denied based on lack of approval from the Chief of Anesthesiology [Schwam] and Chief of Staff for concerns related to Dr. Franzon's unwillingness to accept unequivocal responsibility for supervision in accordance with policies and procedures of the Anesthesiology Service.

The reason for the Board's decision to limit the term of reappointment to six months is based on the recommendation of the Medical Staff that you fail to satisfy Bylaws criteria for working cooperatively and harmoniously with members of the Medical Staff, Hospital Administration, and the Board.

*Ltr. from Watson to Franzon* (March 19, 1996). The Board directed Franzon to "remedy these deficiencies in citizenship and professional relationships with practitioners and staff." *Id.*

A month later, Franzon was quoted in an article in the *Daily Courier Observer* entitled Franzon: MMH Retaliating by Revoking Privileges. *See MMH SMF ¶59; Dkt. No. 569.* The article essentially stated that the MMH Board's decision not to renew Franzon's privileges to supervise CRNAs was motivated by their disapproval of Franzon's public statements in support of midwifery. *See id.* On April 19, Franzon's letter to the editor appeared in the *Daily Courier Observer*, stating, "I believe this refusal [to supervise CRNAs] is made in retaliation for my public comments regarding the services involving Dr. Schwam and Dr. Bakirtzian and for my public support of the nurse-midwifery program." *Id.* at *¶60.* On May 6, a similar

letter to the editor written by Franzon appeared in the *Watertown Daily Times.  See id.* at ¶*61.*  In the following months, Dr. Franzon also spoke out publicly about other MMH issues, including privatization, collective bargaining, and the failure of other doctors to refer patients to him.  *See MMH SMF* ¶¶*62-67; Dkt. No. 569*.

Six months later, Franzon again applied for medical staff privileges. On September 4, 1996, the MMH Credentials Committee, comprised of Drs. Burke, Goswami and non-defendant Smith, met to discuss Franzon's application.  *See id.* at ¶*73.*  At that meeting, the Credentials Committee considered data presented by the hospital's quality assurance department and case reviews performed by doctors who were not employed by MMH.[5] *See id.*  The Committee discussed various incidents of Franzon's alleged inappropriate or deficient care, "citizenship" issues,[6] his delayed response time to pages, his alleged failure to supervise nurse-midwives, and his alleged refusal to supervise CRNAs.  *See id.*  Ultimately, the Credentials Committee voted 2-1 not to recommend the reappointment of Franzon to

---

[5]Defendants now contend that Franzon's records were sent out for external review at his request.

[6]Citizenship refers to a physician's ability to interact with other hospital employees. *See MMH SMF* ¶*73; Dkt. No. 569.*

11

the medical staff.[7]  *See id.*

The matter was then presented to the Medical Executive Committee,[8] which reviewed the Credentials Committee's determination.  *See MMH SMF ¶74; Dkt. No. 569.*  At the meeting, the Executive Committee expressed concern that "there is not one major overriding issue, but multiple issues which cover numerous aspects of patient care."  *MEC Meeting Mins.* (Sept. 10, 1996).  The Executive Committee further noted that Franzon "has been warned on multiple occasions, including his current six month appointment, and he has fought every criticism and has been partially dishonest in his responses."  *Id.*  On September 10, the Executive Committee unanimously voted, with one abstention, to support the Credentials Committee's recommendation not to renew Franzon's medical privileges at MMH.  *See MMH SMF ¶74; Dkt. No. 569.*

By letter dated September 16, 1996, the Executive Committee informed Franzon of its recommendation, citing several reasons in support of its decision.[9]  *See id.* at *¶75.*

---

[7]Smith voted to recommend that Franzon be granted another six month probationary period.  *See id.* at *¶74.*

[8]The MEC was comprised of defendants, Drs. Buscemi, Jhaveri, and Rowe-Button, and other non-defendants.  *See id.*

[9]The Executive Committee cited the following reasons for denying Franzon's application:

12

Dr. Franzon requested a Fair Hearing pursuant to the MMH by-laws to contest the MEC's recommendation. *See id.* at ¶*76.*  At the hearing, the hospital cited numerous examples of Dr. Franzon's sub-standard care. *See MMH SMF ¶77; Dkt. No. 569.*  Several doctors were called as witnesses, s*ee id.* at ¶*78*, and Dr. Franzon was portrayed as uncooperative and unwilling to fairly participate in the Quality Assurance Process.[10]  *See*

------------

- Lack of appropriate patient care judgment which placed patients at undue risk in certain cases reviewed through the Quality Assurance process.

- Failure to participate cooperatively in the Quality Assurance process to improve the quality of patient care at the Hospital.

- Failure to follow Hospital policy in regard to availability for patients when paged or notified.

- Failure to observe Hospital policy and protocols in regard to supervision of your collaborating nurse midwife, resulting in Hospital deliveries outside the scope of her delineated privileges.

- Failure to work harmoniously and professionally with Hospital Staff, Medical Staff and Administrative Staff as evidenced by numerous written complaints against you and despite warning that improvements in your behavior would be expected for reappointment.

- Unwillingness to accept responsibility for surgical supervision of [CRNAs] in accordance with Hospital policies and in a manner which increased patients' anxiety over their safety and welfare in receiving anesthesia services at the Hospital.

*MMH SMF ¶75; Dkt. No. 569; see also ltr. by Watson to Franzon* (Sept. 16, 1996).

   [10]For example, Dr. Franzon allegedly (1) failed to provide the outside reveiwer an ultrasound from his office; (2) had improper direct contact with the outside peer reviewer; (3) refused to accept criticism and comments from the peer reviewer; (4) refused to accept criticism for violating Medicaid consent rules; (5) refused to accept written reprimand for improper contact with the outside reviewer; and (6) refused to accept and/or learn from any peer review comments.  *See MMH SMF ¶79; Dkt. No. 569.*

13

*id.* at ¶*79.*  Dr. Franzon was also charged with failing to follow other

hospital policies, including failure to respond promptly to pages, failing to

properly supervise nurse-midwives (which resulted in deliveries occurring

outside the scope of midwives' delineated privileges), failing to work

harmoniously with other hospital employees, and communicating his

unwillingness to supervise CRNAs in accordance with MMH policy.  *See id.*

at ¶¶*80-84.*

After a lengthy hearing, the Fair Hearing Panel, consisting entirely of

non-defendants, concluded that there was a departure from good medical

practice, that Dr. Franzon violated the midwifery protocol, and that his

citizenship was problematic.  *See MMH SMF ¶85; Dkt. No. 569.*  As such,

they recommended a two-year probationary appointment.  *See id.; see also*

*Fair Hearing Report* (June 27, 1997).

Dr. Franzon appealed the decision of the Fair Hearing Panel to the

Appellate Review Committee, and on August 18, 1997, the Appellate

Review Committee concluded that:

> [a]fter careful review of the hearing panel's final report and
> recommendation..., the closing statements to the panel by Dr.
> Franzon...and also the hearing record of seventeen (17) bound
> volumes..., [and] hearing exhibits,...the Appellate Review
> Committee hereby recommends to modify the fair hearing panel
> recommendation in that Dr. Olof Franzon's application for

14

reappointment to the Medical Staff at [MMH] be denied.

*Appellate Review Comm. Mem.* (Aug. 18, 1997).  Ultimately, the Board of

Managers voted not to renew Franzon's medical privileges at MMH.[11]  *See*

*MMH SMF ¶86; Dkt. No. 569.*

## C.    Dr. Melchiore Buscemi

In 1995, Dr. Buscemi, Chief of Surgery and Executive Committee

member, voiced concerns about several MMH matters, including Franzon's

midwifery program, his failure to consult other doctors about the proposed

midwifery program, and the lack of comradery between Drs. Choi and

Franzon.  *See id.* at ¶¶*95-97.*  Dr. Buscemi voted against the introduction of

midwifery at the MMH Executive Committee meeting in June 1995 and

participated in the February 1996 Department of Surgery meeting, during

which midwifery programs and policies were reviewed.  *See id.* at ¶¶*99,*

*101.*  Dr. Buscemi also attended the September 1996 MMH Executive

Committee meeting regarding Dr. Franzon's application for renewal of

privileges.  *See id.* at ¶*103.*  At that meeting, Dr. Buscemi weighed the

presentations given by Drs. Burke and Smith, both in favor of renewal and

---

[11]Dr. Franzon filed a complaint with the Public Health Council criticizing MMH's failure to offer him a probationary reappointment.  *See MMF SMF ¶89; Dkt. No. 569.*  The Public Health Council rejected Franzon's complaint, finding that MMH's actions were based upon reasonable factors and were supported by principles of due process.  *See id.*

against renewal, respectively.  *See id.*  Dr. Buscemi ultimately voted

against renewal of Franzon's hospital privileges.  *See id.*

Franzon now claims that Buscemi's stated concerns were mere

pretext for his actual wrongful motivation in retaliating against him by voting

not to renew his hospital privileges.  *See Franzon SMF ¶25; Dkt. No. 608.*

Franzon also claims that Dr. Buscemi spoke out negatively against

midwifery and commented that he did not want mid-level practitioners

taking away business from the doctors.  *See Franzon Supp. SMF ¶78; Dkt.*

*No. 671.*  Finally, Franzon claims that Dr. Buscemi made inaccurate and

untruthful statements (including false statements about Franzon's failure to

promptly respond to hospital pages) in a presentation to the Quality

Assurance Committee on June 4, 1996.  *See id.* at *¶¶91, 111-121.*  In

particular, Franzon claims that Dr. Buscemi presented the etopic pregnancy

review, labeling Franzon's case as "less than optimally [sic]."  *Id.*  As such,

Franzon maintains that Dr. Buscemi retaliated against him for speaking out

publicly about MMH policies.

**D.    James B. Watson**

As stated, James Watson was the Chief Executive Officer at MMH.

*See Watson SMF ¶1; Dkt. No. 574.*  When Franzon began seeking support

of his application to supervise CRNAs, Watson wrote Franzon a letter,

asking that he state his qualifications and willingness to accept the

responsibility of supervising CRNAs.  *See id.* at ¶*10.*  Although Franzon

signed and returned the letter acknowledging his qualifications and

acceptance of such responsibilities, his subsequent March 8th letter to

Watson sang a different tune.  *See id.* at ¶*12.*  In this letter, Franzon

expressed hesitation to supervise CRNAs, explaining that neither he nor

any other surgeon "unless they spend at least one month a year working

with an anesthesiologist, are [ ]adequately trained to supervise a nurse

anesthetist." *Id.*  As a result of this letter, the Board of Managers denied

Franzon's request to supervise CRNAs.  *See Watson SMF ¶18; Dkt. No.*

*574.*  Watson informed Franzon of the Board's decision by letter.  *See id.*

After Franzon spoke out publicly about MMH's decision to deny him

supervisory privileges and other hospital policies, the Credentials

Committee voted against renewing his hospital privileges.  *See id.* at ¶*29.*

Watson did not participate in this decision, nor did he have a vote in the

MMH Executive Committee meeting held on September 10, 1996.  *See id.*

Watson did, however, write Franzon a letter dated October 20, 2005,

admonishing him for speaking publicly about MMH policies.  *See Franzon*

17

*Aff. Ex. 9; Dkt. No. 607.*  He also played a very active role in establishing MMH policies and protocols for nurse-midwives and oversaw and reviewed complaints filed against Franzon by other MMH doctors.  *See generally Dkt. Nos. 671-674.*

Based on these undisputed facts, Franzon argues that Watson's conduct, including his expressive disapproval of Franzon's public speech and his active persuasion of the Executive Committee members, evidences his personal involvement in the credentialing process.  As such, he maintains that Watson was personally involved in the alleged retaliatory conduct influential in the decision not to renew Franzon's hospital privileges.

## E.   Dr. Jhayant J. Jhaveri

Dr. Jhaveri, a member of the Board of Managers and the Executive Committee, reported to the Board of Managers during an executive meeting an incident with Dr. Franzon, during which Franzon allegedly threatened Jhaveri with bad press if he did not show his support for midwifery.  *See Jhaveri SMF ¶22; Dkt. No. 547.*  Jhaveri followed up his report with a letter of complaint to defendant Watson.  *See id.* at *¶25.*  He asked Watson to have MMH's legal counsel review it, explaining that Dr.

Franzon had previously intimated that he would take legal action against Jhaveri. *See id.* at ¶26. Dr. Jhaveri also submitted a complaint in 1997 to the Fair Hearing Committee, indicating that Franzon got "right in [his] face" at a November 1996 Board Meeting while Jhaveri was giving a presentation. *See id.* at ¶27. Dr. Jhaveri was familiar with complaints made by Drs. Rowe-Button and Goswami based on Franzon's unprofessional behavior.[12] *See id.* at ¶29. Based on these complaints and others, the Credentials Committee recommended that Franzon's privileges be renewed for a six-month probationary period. *See Jhaveri SMF ¶50; Dkt. No. 547.* During the Executive Committee's consideration of that recommendation, Dr. Jhaveri, mindful of Franzon's citizenship problems and sub-standard reviews, questioned whether Franzon's behavior would change if he were granted a probationary six-month renewal of privileges. *See id.* The Executive Committee ultimately denied Franzon's hospital privileges altogether. *See id.*

Based on these facts, Franzon argues that Dr. Jhaveri both negatively influenced the Executive Committee's consideration of

---

[12]Dr. Jhaveri also suspected Franzon of surreptitiously taping conversations and various meetings of the medical staff and the department of surgery. *See Jhaveri SMF ¶35; Dkt. No. 547.*

Franzon's credentialing and improperly exercised his power to have Franzon's hospital privileges denied.  As such, Franzon maintains that Dr. Jhaveri's conduct was motivated by his unlawful and malicious desire to retaliate against Franzon for speaking publicly about MMH policies.

**F.   Lois Nicandri**

Lois Nicandri, a member of the Community Relations Committee and the Board of Managers, voted against renewing Franzon's first application for supervision over CRNAs.  *See MMH SMF ¶118; Dkt. No. 569*.  She claims that she based her decision on Franzon's own statement that he was not qualified to supervise CRNAs.  *See Franzon Supp. SMF ¶909; Dkt. No. 674*.  Nicandri also voted against the renewal of Franzon's hospital privileges in August 1996 based upon the findings of the Fair Hearing Council.  *See id.* at *¶121*.  Nicandri was personally aware of the issues that were the subject of the Fair Hearing.  *See id.* at *¶123; see also Nicandri Aff.* at *¶23*.  Franzon's sole complaint against Nicandri is that she disregarded her responsibility, as a member of the Board of Managers, to investigate the complaints filed against Franzon.  *See Franzon Supp. SMF ¶¶909-912; Dkt. No. 674*.

**G.   Dr. Tae-Sik Choi**

20

Dr. Choi, a board certified obstetrician/gynecologist with a private practice in Massena, New York, maintained privileges at MMH at all relevant times. *See Choi SMF ¶5; Dkt. No. 589.* Dr. Choi was not a member of the Medical Executive Committee, the Credentials Committee, or any other hospital committee involved in the decision not to renew Dr. Franzon's hospital privileges. *See id.* at *¶7.* Moreover, none of the charges covered at the Fair Hearing were lodged by Dr. Choi. *See id.* at *¶8.*

## H.    Dr. Christine Rowe-Button

Dr. Rowe Button, Chief Radiologist and member of the Executive Committee, *see Rowe-Button SMF ¶4; Dkt. No. 555*, wrote a letter to defendant Watson complaining about an incident during a patient procedure. *See id.* at *¶8.* Specifically, she complained that Dr. Franzon, who speaks with a foreign accent, was present with her during a hysterosalingogram on December 12, 1995. *See id.* at *¶15.* During the procedure, Rowe-Button understood that Franzon told the patient that he had gotten Dr. Rowe-Button "at Sears just for you." *See id.* In his defense, Franzon clarified in a letter that he actually said, "I got her here just for you." *See Rowe-Button SMF ¶17; Dkt. No. 555.* Although Rowe-Button

ultimately voted in her capacity as Executive Committee member not to renew Franzon's hopsital privileges, she based her decision entirely on the recommendation of the Credentials Committee and the information and evidence before her.  *See id.* at ¶¶*26-28*.  To the contrary, Franzon now claims that she based her decision on her personal dislike of Franzon and her disapproval of his public speech.

## I.   Dr. Sateesh K. Goswami

On September 4, 1996, Dr. Goswami, a member of the Credentials Committee, voted against granting Franzon's application for renewal of his hospital privileges.  *See Goswami SMF ¶8; Dkt. No. 631.*  The Credentials Committee only makes recommendations and has no deciding power.  *See id.*  Dr. Goswami claims that Franzon's theory of disparate treatment is misplaced.  Instead, Dr. Goswami points out that Franzon's claim that more of his charts were sent to external review than Dr. Choi's is wholly inaccurate.  *See id.* at ¶*10.*  Dr. Goswami maintains that Franzon objected to internal review, and Choi did not.  *See id.*  Based on his own objections, Franzon's charts were more frequently sent out for external review, while Choi's charts were more often reviewed internally.  *See id.*

## J.   Dr. Edward Burke

At all relevant times, Dr. Burke was an *ex officio*, non-voting member of all hospital committees. *See Burke SMF ¶1; Dkt. No. 622.* He was also a voting member of the Credentials Committee and the Physician Recruitment Committee. *See id.* at *¶4.* Neither of those committees had any authority to terminate or deny Dr. Franzon's application for privileges and reappointment to the MMH medical staff. *See id.* at *¶8.* As part of the Credentials Committee review process, Dr. Burke considered Franzon's entire file from the time he started working at MMH to the time of the application. *See id.* at *¶11.* The file included the current registration, board certification, National Practitioner Data Bank Query, Office Professional Medical Conduct query, references, Quality Assurance file, complaints, and chart reviews. *See Burke SMF ¶10; Dkt. No. 622.* Dr. Burke, as the medical director, attended the Quality Assurance Committee meetings and the Medical Executive Committee meetings. *See id.* at *¶16.* At several of the Executive Meetings in 1995, Dr. Burke spoke out about midwifery guidelines, standards, and delineation of privileges. *See id.* at *¶44.* On March 11, 1996, Dr. Burke sent a letter to the Chief of Staff, Dr. Bakirtzian, outlining an incident between Drs. Franzon and Goswami, during which Dr. Burke overheard Franzon loudly berating Goswami for failing to refer to him

a patient for an ultrasound examination.  *See id.* at *¶81.*  On June 11, Dr.

Burke presented to the Executive Committee the results of an obstetrical

data review compiled by the Quality Assurance Department.  *See Burke*

*SMF ¶102; Dkt. No. 622.*  Based on the review, the Executive Committee

concluded that Franzon's charts should be monitored for tubal ligation,

bladder lacerations, perinatal deaths, and ectopic pregnancies.  *See id.*  On

September 4, Dr. Burke attended a meeting of the Credentials Committee

at which he reviewed Franzon's entire file in consideration of his application

for renewal of hospital privileges.  *See id.* at *¶¶108-109.*  The Credentials

Committe voted 2-1 to recommend that Franzon's privileges not be

renewed.  *See id.* at *¶113.*  Dr. Smith, who represented the minority

opinion, and Dr. Burke, representing the majority opinion, presented the

committee's recommendation at the Medical Executive Committee on

September 10.  *See Burke SMF ¶114; Dkt. No. 622.*  Dr. Burke also

testified at the Fair Hearing Panel in January and February of 1997.  *See*

*id.* at *¶122.*

Franzon now claims that Dr. Burke's presentations at the Executive

Committee meetings influenced the ultimate decision not to renew

Franzon's hospital privileges.  Franzon argues that Dr. Burke's influence

over the Executive Committee was motivated by his personal disapproval of Franzon's open and public speech about MMH policies.

## K.   **Christine (Tina) Corcoran**

Tina Corcoran, the Director of Public Relations at MMH, regularly attended the open sessions of the Board of Managers.  *See Corcoran SMF ¶¶1-2; Dkt. No. 594.*  Corcoran was not a member of the Medical Executive Committee, the Board of Managers, or any hospital board or committee involved in Dr. Franzon's credentialing.  *See id.* at *¶6.*  Corcoran lodged no complaints against Franzon, instigated no investigations, and had no input into Franzon's credentialing.  *See id.* at *¶¶7-14.*

## L.   **Kenneth Maxik**

Kenneth Maxik, the Senior Director of Administrative Services at MMH, attended the open sessions of the Board of Managers.  *See Maxik SMF ¶1; Dkt. No. 583.*  Maxik played an active role in creating and editing the proposed protocols for the MMH midwifery program, and Franzon repeatedly accused Maxik of secretly removing or changing parts of the adapting midwifery policies.  *See id.* at *¶¶38-88.*  Although Maxik filed two letters of complaint about Franzon's behavior, he played no part in the decision-making process regarding Franzon's application for renewal of his

25

hospital privileges.  *See id.* at ¶*113.*

## M.   <u>The Litigation</u>

In February 1997, Franzon commenced this lawsuit, claiming violations of his First and Fourteenth Amendment rights and asserting various state law claims.  As noted, Franzon contends that defendants conspired to deny him his medical staff privileges in retaliation for having publicly spoken out about MMH policies.  In support of his claim, Franzon alleges that he was improperly treated in retaliation for exercising his free speech.  In particular, Franzon contends that defendants subjected a disproportionate number of his cases to outside peer review as compared to Choi in order to create a negative record of Franzon's performance, "papered" his credentials file with unfounded complaints, maliciously caused a New York State Department of Health investigation into his performance, and maliciously instituted internal department reviews of his charts and performance statistics.  Franzon maintains that this conduct resulted in his disparate treatment, as evidenced by the fact that other MMH physicians who engaged in similar or more serious professional misbehavior and sub-standard patient care were not relieved of their hospital privileges.

## III.  Discussion

## A.    Motion for Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing FED. R. CIV. P. 56(c)); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165,170 (2d Cir. 2006) (citation omitted).  All reasonable inferences must be drawn in favor of the nonmoving party.  *See Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*,  477 U.S. 317, 323 (1986) (citation omitted); *see also SEC. v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005).  "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party."  *Dister v. Cont'l Group*, *Inc.*, 859

F.2d 1108, 1114 (2d Cir. 1988) (citation omitted).  However, "[c]onclusory allegations, conjecture and speculation...are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has held that Federal Rule of Civil Procedure 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2001) (citing *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030-31 (9th Cir. 2001) (holding that it is unfair to the district court, to other litigants, and to the movant to impose a duty on the district court to "search and sift the factual record for the benefit of the defaulting party.")).  Moreover, "because nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations."  *Id.* at 470-71 (citing FED. R. CIV. P. 83(b) (allowing district court to regulate motion practice in any manner consistent with federal law and the federal rules)).

Although the Circuit has granted considerable latitude to district courts "in fashioning rules that will assist them in determining whether

summary judgment is appropriate, they may not impose sanctions on

litigants for noncompliance with any requirement not in federal law, federal

rules, or the local district rules unless the alleged violator has been

furnished in the particular case with actual notice of the requirement."  *Id.* at

471 (citing FED. R. CIV. P. 83(b)).  Therefore, "in the absence of a local rule,

a district court may not grant summary judgment on the ground that the

nonmovant's papers failed to cite to the record unless the parties are given

actual notice of the requirement."  *Id.*

## B.    The Motions

### 1.    Supplemental Filings

As an initial matter, the court has considered the parties'

supplemental filings, namely, Franzon's supplemental Statement of

Material Facts, *see Dkt. Nos. 671, 672, 673, 674*, and Jhaveri's and

Goswami's orders to show cause requesting that the court strike Franzon's

additional statements from the record.  *See Dkt. Nos. 677, 679.*

During oral argument on November 18, 2004, the court engaged

Franzon in a lengthy discussion regarding his failure to submit a concise

Statement of Material Facts in accordance with Local Rule 7.1.[13]  *See Dkt.*

_____

[13] Local Rule 7.1(a)(3) states, in pertinent part:

*No. 656.* The court does not now wish to rehash that discussion; however, it is mindful of the advice it gave counsel during that hearing. *See id.* For the reasons orally stated by the court on November 18, Franzon was granted additional time to file a supplemental Statement of Material Facts that complied with Local Rule 7.1. Docket numbers 671-674 reflect Franzon's supplemental Statement. However, Franzon's filings again fail to comply with the Local Rules.[14]

After its review of the supplemental filings, the court partially grants Jhaveri's and Goswami's orders to show cause insofar as they seek to strike Franzon's supplemental Statement from the record. The court declines to issue sanctions at this juncture. *See Amnesty Am.*, 288 F.3d at 470-71 (cautioning against ordering sanctions for noncompliance with a local rule unless ample notice has been afforded to the defaulting party). Accordingly, and for the reasons stated, Jhaveri's and Goswami's orders to

---

> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.

N.Y.N.D. R. 7.1(a)(3).

[14]As defendants correctly point out, Franzon's additional filings are 258 pages long and contain 966 paragraphs. Moreover, they do not mirror defendants' Statements such that the court can ascertain Franzon's response or counter-statement to each of defendant's numbered paragraphs. For these reasons, they are substantially noncompliant with Local Rule 7.1.

show cause are granted in part and denied in part.

### 2.    First Amendment Claims

#### a.    Retaliation

With this in mind, the court will now consider the final issue pending,

namely, whether any or all of the defendants are entitled to summary

judgment on Franzon's First Amendment claim.  As stated, the court has

stricken Franzon's supplemental Statement of Material Facts from the

record.  Nevertheless, in its effort to afford Franzon every benefit and draw

every inference in Franzon's favor, *see Celotex*, 524 F.2d 1317, the court

has looked to both Franzon's original Statement of Material Facts and his

supplemental filings to find support for his contested statements.  As such,

although the court refers to Franzon's original Statement of Material Facts,

*see Dkt. No. 608*, as the operative Statement, it has also searched within

Franzon's supplemental filings to support the facts guiding this decision.

As is the established law in this Circuit, to state a claim pursuant to

42 U.S.C. § 1983, a plaintiff must satisfy two essential elements.  First, "the

defendant acted under color of state law."  *Annis v. County of Westchester*,

136 F.3d 239, 245 (2d Cir. 1998).  Second, that, "as a result of the

defendant's actions, the plaintiff suffered a denial of his federal statutory

rights or his constitutional rights or privileges." *Id.*

The First Amendment of the United States Constitution provides in relevant part that "Congress shall make no law...abridging the freedom of speech..." U.S. CONST. am. I.  The First Amendment applies to the states through its incorporation under the Fourteenth Amendment of the Constitution.  *See Nike, Inc. v. Kasky*, 539 U.S. 654, 658 (2003); *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006).

In order to establish a *prima facie* First Amendment retaliation claim under § 1983, a plaintiff must show that (1) he engaged in constitutionally protected speech; (2) he suffered an adverse employment action; and (3) his speech was a motivating factor in the adverse employment action.  *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (citing *Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) (holding that a public employee plaintiff is *not* required to show that the defendants' action had an actual chilling effect. ).  In proving the third element, a plaintiff asserting a First Amendment retaliation claim must show "a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999).  In

addition, "plaintiffs must show that each defendant was personally

involved...in the alleged constitutional deprivations." *Skehan v. Vill. of*

*Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006).

"If a plaintiff establishes these three factors, the defendant has the

opportunity to show by a preponderance of the evidence that it would have

taken the same adverse employment action even in the absence of the

protected conduct." *Id.*  The court will consider these three element in turn,

citing the facts that either support or impede Franzon's claim as alleged

against each moving defendant.

### i.    Protected Speech

First, "[t]he question of whether certain speech enjoys a protected

status under the First Amendment is one of law, not fact." *Id.*  Generally,

"speech on any matter of political, social, or other concern to the

community is protected by the First Amendment." *Morris*, 196 F.3d at 110

(internal quotation marks and citation omitted).  Here, the parties agree that

Franzon's speech enjoys protection under the First Amendment.

Accordingly, the first element of Franzon's retaliation claim is satisfied as

against all defendants.

### ii.    Adverse Employment Action

"Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Id.* (internal quotation marks and citation omitted).  Indeed, lesser sanctions may also be considered adverse employment actions.  *See Bernheim v. Litt*, 79 F.3d 318, 327 (2d Cir. 1996).  Here, it is undisputed that Franzon suffered an adverse employment action when his hospital privileges were not renewed.  Accordingly, the second element of Franzon's retaliation claim is satisfied as against all defendants.

### ii.    Causal Connection Sufficient to Show Retaliation was Motivating Factor for Employment Decision

The third element of Franzon's claim requires him to show a causal connection between the adverse employment action and the defendants' improper motivation.  The evidence must be "sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech."  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  "[A] plaintiff can prove First Amendment retaliation even if the measures taken by [the defendants] were otherwise justified."

*Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152 (2d Cir.

2006).

Causation can be established either indirectly by means of

circumstantial evidence, for example, by showing that the protected activity

was followed by adverse treatment in employment, or directly by evidence

of retaliatory animus. *See Sumner v. U.S.P.S.*, 899 F.2d 203, 209 (2d Cir.

1990); *see also Posr v. Court Officer Shield # 207*, 180 F.3d 409, 418 (2d

Cir. 1999) ("[T]he plaintiff...need not clearly establish that the defendant

harbored retaliatory intent.  It is sufficient to allege facts which could

reasonably support an inference to that effect.").  Summary judgment is

precluded where questions regarding an employer's motive predominate in

the inquiry regarding how important a role the protected speech played in

the adverse employment decision. *See Piesco v. City of New York*, 933

F.2d 1149, 1155 (2d Cir. 1991).

To satisfy the causal connection requirement of his *prima facie* case,

Franzon must show that his public criticism of MMH was "a substantial

motivating factor" in defendants' decision not to renew his hospital

privileges. *Washington v. County of Rockland*, 373 F.3d 310, 321 (2d Cir.

2004).  "To do so, [he] must aver some 'tangible proof' demonstrating that

[his] protected speech animated [defendants'] decision..." not to renew his

privileges.  *Id.* (citation omitted).   Franzon "may not rely on conclusory

assertions of retaliatory motive."  *Id.*  Finally, a plaintiff may establish the

required causal nexus by showing a close temporal proximity between his

protected statements and the adverse employment action.  *See Morey v.*

*Somers Centr. Sch. Dist.*, 06-CV-1877, 2007 U.S. Dist. LEXIS 20265, at

*38-39 (S.D.N.Y. March 21, 2007) (citing *Feingold v. New York*, 366 F.3d

138, 157 (2d Cir. 2004) (holding that a two-week lapse between the

plaintiff's initial complaint to his supervisor and the adverse employment

action was sufficient); *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d

545, 555 (2d Cir. 2001) (holding that a four-month interval was "sufficient to

support an allegation of a causal connection strong enough to survive a

summary judgment motion"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d

759, 769 (2d Cir. 1998) (holding that a three-month interval was sufficient);

*Calabro v. Nassau Univ. Med. Ctr.*, 424 F. Supp. 2d 465, 473 (E.D.N.Y.

2006) ("though there is no bright-line rule, an adverse employment action

following within a couple [of] months of the protected activity typically,

indirectly establishes the causal connection")).

The court will separately consider whether Franzon has established

this required causal connection as the facts pertain to each individually named defendant.

### (A)   MMH, MMH Executive Committee, MMH Board of Managers

Franzon alleges that MMH and its governing bodies retaliated against him when they opted not to renew his hospital privileges months after he spoke out publicly about MMH policies.  Indeed, in late 1995 and early 1996, Franzon was quoted in several newspapers including the *Daily Courier Observer*, *see MMH SMF ¶59; Dkt. No. 569*, and the *Watertown Daily Times.  See id.* at *¶61.*  In the following months, Dr. Franzon also spoke out publicly about other MMH issues, including privatization, collective bargaining, and the failure of other doctors to refer patients to him.  *See MMH SMF ¶¶62-67; Dkt. No. 569*.

Six months later, Franzon applied for renewal of his medical staff privileges.  After the Credentials Committee voted 2-1 not to recommend the reappointment of Franzon to the medical staff, *see id.,* the matter was presented to the Medical Executive Committee, which reviewed the Credentials Committee's determination.  *See MMH SMF ¶74; Dkt. No. 569*. On September 10, the Executive Committee unanimously voted, with one abstention, to support the Credentials Committee's recommendation not to

renew Franzon's medical privileges at MMH.  *See MMH SMF ¶74; Dkt. No.
569*.

Viewing these facts in the light most favorable to Franzon, it was
within months after Franzon's public statements about the hospital that
MMH and its governing bodies decided not to renew his hospital privileges.
As stated, an adverse employment action taken in close temporal proximity
with a plaintiff's protected speech indirectly establishes the required causal
connection.  *See Morey*, 2007 U.S. Dist. LEXIS 20265, at *38-39.

Although the MMH defendants argue that the decision not to renew
Franzon's medical privileges would have been made even in the absence
of his protected speech, this remains a question of fact to be resolved at
trial.  *See DePace v. Flaherty*, 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002)
("Causation generally is a question for the finder of fact.  On this motion,
the role of the Court is to determine whether [the plaintiff] has alleged facts
that could support a reasonable finding of a causal connection between his
protected speech and the adverse employment action.").

As stated, these defendants, as MMH's governing bodies, had
authority to make final and binding decisions and policies on behalf of the
hospital.  *See Konits v. Valley Stream Cent. High Sch. Dist.*, 01-CV-6763,

2006 U.S. Dist. LEXIS 5610, at *13 (E.D.N.Y. Jan. 28, 2006).[15]  Based on the undisputed facts and the close temporal relationship between MMH's employment actions and Franzon's protected speech, the court finds that a fair-minded jury could reasonably conclude that Franzon lost his hospital privileges because of his speech.  As such, Franzon has satisfied all three elements of his *prima facie* retaliation claim against the MMH defendants.  Accordingly, the MMH defendants' motion for summary judgment is denied.

### (B)   Dr. Melchiore Buscemi

As a member of the Executive Committee, Dr. Buscemi played an active and personal role in the ultimate decision not to renew Franzon's hospital privileges.  As stated, Buscemi voted against the introduction of midwifery at the MMH Executive Committee meeting in June 1995 and participated in the February 1996 Department of Surgery meeting, during

---

[15]All defendants allege they are entitled to qualified immunity.  Indeed, defendants are entitled to assert qualified immunity for damages under § 1983 when the facts alleged constitute a deprivation of a constitutional right and also if: "(1) the legal right said to be violated was not clearly established at the time of the defendant's conduct; or (2) the defendant's action was objectively reasonable in light of the clearly established legal rules then in effect."  *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 107 (2d Cir. 2006).

As is widely established in this Circuit, retaliatory action against an employee is unconstitutional.  *See id.*  This legal precedent was clearly established at the time of the relevant conduct.  *See id.*  As such, none of the individually named defendants are entitled to qualified immunity.

The MMH defendants also maintain that they are qualifiedly immune.  The court disagrees with their argument.  As the Circuit has held, "a supervisory defendant may be held liable if it personally participated in the alleged constitutional violation."  *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001).  Because the MMH defendants directly participated in the alleged unconstitutional conduct, they are not entitled to qualified immunity.

which midwifery programs and policies were reviewed.  *See MMH SMF*

*¶99, Dkt. No. 569.*  At the September 1996 MMH Executive Committee

meeting regarding Dr. Franzon's application for renewal of privileges, Dr.

Buscemi weighed the presentations given by Drs. Burke and Smith, both in

favor of renewal and against renewal, respectively, and ultimately voted

against renewal of Franzon's hospital privileges.  *See id.* at  *¶103.*

Franzon now claims that Buscemi's stated concerns were mere

pretext for his actual wrongful motivation in retaliating against him by voting

not to renew his hospital privileges.  *See Franzon SMF ¶25; Dkt. No. 608.*

Franzon also claims that Dr. Buscemi spoke out negatively against

midwifery and commented that he did not want mid-level practitioners

taking away business from the doctors.  *See Franzon Supp. SMF ¶78; Dkt.*

*No. 671.*  Finally, Franzon claims that Dr. Buscemi made inaccurate and

untruthful statements (including false statements about Franzon's failure to

promptly respond to hospital pages) in a presentation to the Quality

Assurance Committee on June 4, 1996.  *See id.* at *¶¶91, 111-121.*  In

particular, Franzon claims that Dr. Buscemi presented the etopic pregnancy

review, labeling Franzon's case as "less than optimally [sic]."  *Id.*  As such,

Franzon maintains that Dr. Buscemi retaliated against him for speaking out

publicly about MMH policies.

It is undisputed that Buscemi, as a member of the Executive Committee, had final decision-making authority over Franzon's credentialing.  Moreover, Buscemi vocalized negative concerns about Franzon's suggested midwifery program, including concerns that the additional staff would jeopardize the current practitioners' business.  The parties dispute whether Buscemi did, in fact, manipulate quality assurance studies and present untruthful statements to the Executive Committee in an effort to discolor Franzon's competence as a doctor.

At this juncture, the court must simply determine whether, on the facts alleged, a reasonable jury could infer "that the protected speech was a substantial motivating factor in the adverse employment action."  *Mount Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287.  Based on the facts alleged, the court concludes that a reasonable jury could infer that Dr. Buscemi had an improper retaliatory motive.  Franzon has satisfied all three elements of his *prima facie* retaliation case against Dr. Buscemi. Accordingly, Buscemi's motion for summary judgment is denied.

### (C)   James B. Watson

Like Buscemi, the court holds that defendant Watson, as the Chief

Executive Officer at MMH, had influence over the final decision not to renew Franzon's privileges.  *See Watson SMF ¶1; Dkt. No. 574.*  He also directly participated in the final decision by submitting correspondence between he and Franzon to the Executive Committee and actively admonishing Franzon for speaking out publicly about MMH policies.  *See id.* at *¶12; see also Franzon Aff. Ex. 9, Dkt. No. 607.*  As such, Franzon has satisfied his burden of demonstrating Watson's personal involvement.

Although Watson did not participate in the Credentials Committee recommendation, nor did he vote in the MMH Executive Committee meeting held on September 10, 1996, he did, however, play a very active role in establishing MMH policies and protocols for nurse-midwives and overseeing and reviewing complaints filed against Franzon by other MMH doctors.  *See generally Dkt. Nos. 671-674.*  He also edited complaints filed by other doctors against Franzon and submitted them for Board review.  Finally, Franzon alleges that Watson treated him differently than other doctors.  In particular, Franzon claims that Watson refused to take action against Dr. Choi for the same misconduct for which Franzon was reprimanded.[16]

---

[16]Both Drs. Choi and Franzon responded late to hospital pages.  However, Franzon claims that only he was reprimanded for his failure to promptly respond to pages.

Perhaps the best evidence of Watson's alleged retaliatory animus is documented in his October 2005 letter.  In that letter, he admitted that he was "writing to urge that [Franzon] cease [his] public and personal attacks on Massena Memorial Hospital and its medical staff in connection with the Hospital's consideration of credentialing and nurse midwifery."  *Franzon Aff. Ex. 9, Dkt. No. 607*.  Watson's letter commented that "it is not helpful to this process to publicly attack the Medical Executive Committee" and "[n]one of us benefit from continued negative publicity, threats or personal attacks."  *Id.*

The court concludes that Watson's October 2005 letter alone could reasonably give rise to an inference that Watson had an improper motive since it expressed disapproval of Franzon's speech and advised Franzon to cease his public statements.  Moreover, Watson was personally involved in reviewing complaints and presenting such complaints to the Board.  As such, the court concludes that Franzon has presented facts which, if true, could establish Watson's retaliatory motive.  Franzon has satisfied all three elements of his *prima facie* retaliation case against Watson.  Accordingly, Watson's motion for summary judgment is denied.

**(D)   Dr. Jayant J. Jhaveri**

43

Similarly, Dr. Jhaveri, a member of the Board of Managers and the Executive Committee, played an active and personal role in Franzon's credentialing. *See Jhaveri SMF ¶22; Dkt. No. 547.* He filed complaints about Franzon's citizenship problems and personally reported to the Board of Managers an incident during which Franzon allegedly threatened Jhaveri with bad press if he did not show his support for midwifery. *See id.* Dr. Jhaveri also submitted a complaint in 1997 to the Fair Hearing Committee, indicating that Franzon got "right in [his] face" at a November 1996 Board Meeting while Jhaveri was giving a presentation. *See id.* at ¶27.

Dr. Jhaveri was familiar with complaints made by Drs. Rowe-Button and Goswami based on Franzon's unprofessional behavior.[17]  *See id.* at ¶29. He voted during the Executive Committee's consideration of Franzon's application for renewal of privileges, and mindful of Franzon's citizenship problems and sub-standard reviews, questioned whether Franzon's behavior would change if he were granted a probationary six-month renewal of privileges. *See id.* The Executive Committee ultimately denied Franzon hospital privileges altogether. *See id.*

---

[17]Dr. Jhaveri also suspected Franzon of surreptitiously taping conversations and various meetings of the medical staff and the department of surgery. *See Jhaveri SMF ¶35; Dkt. No. 547.*

Based on these facts, Franzon argues that Dr. Jhaveri both negatively influenced the Executive Committee's consideration of Franzon's credentialing and improperly exercised his power not to renew Franzon's hospital privileges.  At this juncture, the court concludes that Franzon has established a causal connection between his protected speech and Dr. Jhaveri's personal involvement in the decision not to renew Franzon's hospital privileges.  As such, Franzon has satisfied all three elements of his *prima facie* retaliation case against Dr. Jhaveri. Accordingly, Dr. Jhaveri's motion for summary judgment is denied.

### (E)   Dr. Edward Burke

As stated, Dr. Burke was an *ex officio*, non-voting member of all hospital committees, *see Burke SMF ¶1; Dkt. No. 622,* and a voting member of the Credentials Committee and the Physician Recruitment Committee.  *See id.* at *¶4.*  As part of the Credentials Committee review process, Dr. Burke considered Franzon's entire file in deciding whether to recommend renewal of Franzon's hospital privileges.  *See id.* at *¶11.*  Dr. Burke, as the medical director, attended the Quality Assurance Committee meetings and the Medical Executive Committee meetings.  *See id.* at *¶16.* At several of the Executive Meetings in 1995, Dr. Burke spoke out about

45

midwifery guidelines, standards, and delineation of privileges.  *See id.* at

¶*44.*  He also sent a letter to the Chief of Staff outlining an incident between

Drs. Franzon and Goswami, during which he overheard Franzon loudly

berating Goswami for failing to refer a patient to him for an ultrasound

examination.  *See id.* at ¶*81.*

On June 11, Dr. Burke presented to the Executive Committee the

results of an obstetrical data review compiled by the Quality Assurance

Department.  *See Burke SMF* ¶*102; Dkt. No. 622.*  Based on the review,

the Executive Committee concluded that Franzon's charts should be

monitored for tubal ligation, bladder lacerations, perinatal deaths, and

ectopic pregnancies.  *See id.*  On September 4, Dr. Burke attended a

meeting of the Credentials Committee at which he reviewed Franzon's

entire file in consideration of his application for renewal of hospital

privileges.  *See id.* at ¶¶*108-109.*  The Credentials Committe voted 2-1 to

recommend that Franzon's privileges not be renewed.  *See id.* at ¶*113.*  Dr.

Burke, representing the majority opinion, presented the committee's

recommendation at the Medical Executive Committee on September 10.

*See Burke SMF* ¶*114; Dkt. No. 622.*  Dr. Burke also testified at the Fair

Hearing Panel in January and February of 1997.  *See id.* at ¶*122.*

Franzon now claims that Dr. Burke's presentations at the Executive Committee meetings negatively influenced the ultimate decision not to renew Franzon's hospital privileges.  Franzon argues that Dr. Burke's influence over the Executive Committee was motivated by his personal disapproval of Franzon's open and public speech about MMH policies.

In light of the undisputed facts, and drawing all inferences in Franzon's favor, the court concludes that Franzon has established a causal connection between his protected speech and Dr. Burke's personal involvement in the decision not to renew Franzon's hospital privileges.[18]  As such, Franzon has satisfied all three elements of his *prima facie* retaliation case against Dr. Burke.  Accordingly, Dr. Burke's motion for summary judgment is denied.

> **(F)   Defendants Nicandri, Dr. Rowe-Button, Dr. Goswami, Dr. Choi, Tina Corcoran, and Kenneth Maxik**

Insofar as these defendants are alleged to have participated in the

---

[18]Although it is tenuous, the court's sole inquiry at this juncture is whether Franzon has alleged a set of facts which, if true, could lead a reasonable jury to conclude that Dr. Burke had a retaliatory motive in influencing the decision not to renew Franzon's hospital privileges. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Here, looking at the facts as they most favor Franzon, the court concludes that Dr. Burke's negative influence over the Executive Committee's decision not to renew Franzon's hospital privileges could reasonably be viewed as retaliatory.  Indeed, Franzon spoke out publicly about midwifery, a topic about which Dr. Burke openly voiced concerns.  As such, a jury could reasonably infer that Dr. Burke's motive was improper.

improper retaliatory conduct against Franzon, the court concludes that Franzon has failed to state a First Amendment retaliation claim against them. Although Franzon has satisfied the first two elements of his *prima facie* claim, he has not demonstrated that any of these defendants directly participated in the alleged unconstitutional conduct, had an improper retaliatory motive for their actions, or directly influenced the decision not to renew Franzon's hospital privileges.

Lois Nicandri, a member of the Community Relations Committee and the Board of Managers, voted against renewing Franzon's first application for supervision over CRNAs. *See MMH SMF ¶118; Dkt. No. 569.* She claims that she based her decision on Franzon's own statement that he was not qualified to supervise CRNAs. *See Franzon Supp. SMF ¶909; Dkt. No. 674.* Franzon has offered no evidence, direct or circumstantial, to refute Nicandri's assertions. Moreover, Franzon's sole complaint against Nicandri is that she ignored her responsibility to investigate certain complaints filed against him. *See Franzon Supp. SMF ¶¶909-912; Dkt. No. 674.* As such, Franzon has failed to demonstrate a causal connection between his protected speech and Nicandri's alleged misconduct. Accordingly, Franzon's First Amendment claim against Nicandri is

48

dismissed.

Similarly, Franzon cannot satisfy a causal nexus between his protected speech and the alleged misconduct of Drs. Goswami, Rowe-Button, and Choi. Dr. Rowe Button lodged a complaint against Franzon, alleging that he told a patient during a procedure that he had gotten Dr. Rowe-Button "at Sears just for you." *Rowe-Button SMF ¶4; Dkt. No. 555.* Although Rowe-Button ultimately voted in her capacity as an Executive Committee member not to renew Franzon's hospital privileges, she claims that she based her decision entirely on the recommendation of the Credentials Committee and the information and evidence before her. *See id.* at ¶¶*26-28.* Likewise, Dr. Goswami, a member of the Credentials Committee, voted against granting Franzon's application for renewal of his hospital privileges. *See Goswami SMF ¶8; Dkt. No. 631.* Dr. Goswami's vote had no deciding power and no binding effect. *See id.* Dr. Goswami based his decision entirely on Franzon's file. Franzon has offered no factual evidence to refute Dr. Rowe-Button's or Dr. Goswami's assertions. As such, he has failed to state a First Amendment retaliation claim against them.

Moreover, Franzon cannot sustain a First Amendment retaliation

claim against Dr. Choi.  The undisputed facts demonstrate that Choi was not a member of the Medical Executive Committee, Credentials Committe, or any other committee involved in Franzon's credentialing;  he had no input whatsoever into the Credentials Committee's recommendation not to renew Franzon's privileges; he did not testify against Franzon at the Fair Hearing; and he was not involved in the development of the nurse midwifery protocol.  *See Choi SMF ¶¶5-10; Dkt. No. 589.*  Franzon has offered no evidence to refute Choi's assertions, nor has he shown that Choi participated in the decision not to renew Franzon's hospital privileges.  As such, he has failed to state a First Amendment retaliation claim against defendant Choi.

Insofar as Franzon alleges that Tina Corcoran and Kenneth Maxik retaliated against him in violation of his First Amendment rights, he fails to state claims against them both.  Tina Corcoran, the Director of Public Relations at MMH, regularly attended the open sessions of the Board of Managers.  *See Corcoran SMF ¶¶1-2; Dkt. No. 594.*  Corcoran was not a member of the Medical Executive Committee, the Board of Managers, or any hospital board or committee involved in Dr. Franzon's credentialing.  *See id.* at *¶6.*  Corcoran lodged no complaints against Franzon, instigated

no investigations, and had no input into Franzon's credentialing.  *See id.* at

¶¶*7-14.*  Franzon has not alleged facts demonstrating that Corcoran played

any role in the decision to deny him hospital privileges.  Likewise, although

Maxik filed two letters of complaint about Franzon's behavior, he played no

part in the decision-making process regarding Franzon's application for

renewal of his hospital privileges.  *See Maxik SMF ¶113; Dkt. No. 583.*

Franzon repeatedly accused Maxik of secretly removing or changing parts

of the adapting midwifery policies.  *See id.* at ¶¶*38-88.*  However, he fails to

demonstrate how this alleged misconduct is causally related to Franzon's

protected speech.  As such, he has failed to state a First Amendment

retaliation claim against defendants Corcoran and Maxik.  Accordingly,

Franzon's First Amendment retaliation claims against defendants Nicandri,

Dr. Rowe-Button, Dr. Goswami, Dr. Choi, Tina Corcoran, and Kenneth

Maxik are dismissed.

### b.   Conspiracy

Franzon's amended complaint alleges that defendants engaged in a

conspiracy to deprive him of his First Amendment rights.  "To prove a §

1983 conspiracy, a plaintiff must show: (1) an agreement between two or

more state actors or between a state actor and a private entity; (2) to act in

concert to inflict an unconstitutional injury; and (3) an overt act done in

furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200

F.3d 65, 72 (2d Cir. 1999).  "While conclusory allegations of a § 1983

conspiracy are insufficient,...such conspiracies are by their very nature

secretive operations, and may have to be proven by circumstantial, rather

than direct, evidence."  *Id.* (internal quotations and citations omitted).  The

Second Circuit has instructed that:

> To state a claim of conspiracy under § 1983, the complaint must
> contain more than mere conclusory allegations....And while a plaintiff
> should not plead mere evidence, he should make an effort to provide
> some details of time and place and the alleged effect of the
> conspiracy. Thus, complaints containing only conclusory, vague, or
> general allegations that the defendants have engaged in a conspiracy
> to deprive the plaintiff of his constitutional rights are properly
> dismissed; diffuse and expansive allegations are insufficient, unless
> amplified by specific instances of misconduct.

*Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993) (internal

citations and quotations omitted).

Insofar as the amended complaint alleges a conspiracy claim against

defendants MMH, MMH Board of Managers, MMH Executive Committee,

Drs. Buscemi, Jhaveri, and Burke, and Watson, the court need not consider

the merits of such claims at this juncture.  Based on the court's holding, the

lawsuit survives against those defendants.  As such, it is unnecessary now

to consider Franzon's conspiracy claim, as all remaining issues will be resolved at trial.

Regardless of whether a conspiracy actually existed, the threshold inquiry is whether the facts alleged are sufficient to demonstrate that the named defendant created, participated, or acted in furtherance of an express or implicit agreement.  Since the court has already determined that the allegations are insufficient to state a retaliation claim against defendants Nicandri, Drs. Rowe-Button, Goswami, and Choi, Tina Corcoran, and Kenneth Maxik, Franzon is certainly unable to state a claim against these defendants based on an alleged conspiracy to retaliate against him.  Accordingly, insofar as Franzon's amended complaint asserts claims based on a conspiracy against defendants Nicandri, Dr. Rowe-Button, Dr. Goswami, Dr. Choi, Tina Corcoran, and Kenneth Maxik, all such claims are dismissed.

## V. __Conclusion__

Upon careful consideration of the parties' submissions, their oral arguments, and the relevant law, the court concludes that there is no basis in law or fact for Franzon's First Amendment claims against defendants Nicandri, Corcoran, Maxik, and Drs. Rowe-Button, Goswami, and Choi.  As

such, all such claims against those defendants are **DISMISSED.**  The

remaining defendants' motions are **DENIED** insofar as they seek to dismiss

Franzon's First Amendment claims, and those claims against them based

on retaliation and conspiracy to retaliate are deemed trial-ready.

**WHEREFORE**, for the foregoing reasons, it is hereby

     **ORDERED** that Jhaveri's and Goswami's motions for preliminary

injunction, requesting that the court strike Franzon's additional Statement of

Material Facts from the record, (*Dkt. Nos. 677, 679*) are **GRANTED** insofar

as they seek to strike Franzon's Statement (*Dkt. Nos. 671, 672, 673, 674*)

from the record and **DENIED** insofar as they seek the imposition of

sanctions; and it is further

     **ORDERED** that MMH, MMH Board of Managers, MMH Executive

Committee, Melchiore Buscemi and Lois Nicandri's motion for summary

judgment (*Dkt. No. 559*) is:

          1.    **GRANTED** insofar as it seeks dismissal of Franzon's First

                Amendment retaliation and conspiracy claims against Lois

                Nicandri and

          2.    **DENIED** insofar as it seeks dismissal of Franzon's First

                Amendment retaliation and conspiracy claims against

54

MMH, MMH Board of Managers, MMH Executive

Committee, and Melchiore Buscemi; and it is further

**ORDERED** that Watson's motion for summary judgment (*Dkt. No.*

*571*) is **DENIED**; and it is further

**ORDERED** that Jhaveri's motion for summary judgment (*Dkt. No.*

*545*) is **DENIED**; and it is further

**ORDERED** that Dr. Burke's motion for summary judgment (*Dkt. No.*

*621*) is **DENIED**; and it is further

**ORDERED** that Dr. Rowe-Button's motion for summary judgment

(*Dkt. No. 551*) is **GRANTED**, and all claims against her are **DISMISSED**;

and it is further

**ORDERED** that Kenneth Maxik's motion for summary judgment (*Dkt.*

*No. 578*) is **GRANTED**, and all claims against him are **DISMISSED**; and it

is further

**ORDERED** that Dr. Sateesh Goswami's motion for summary

judgment (*Dkt. No. 629*) is **GRANTED**, and all claims against him are

**DISMISSED**; and it is further

**ORDERED** that Dr. Tae-Sik Choi's motion for summary judgment

(*Dkt. No. 587*) is **GRANTED**, and all claims against him are **DISMISSED**;

and it is further

ORDERED that Tina Corcoran's motion for summary judgment (*Dkt. No. 593*) is **GRANTED**, and all claims against her are **DISMISSED**; and it is further

ORDERED that Franzon's surviving First Amendment retaliation and conspiracy claims against MMH, MMH Board of Managers, MMH Executive Committee, Dr. Melchiore Buscemi, James B. Watson, Dr. Jhaveri, and Dr. Burke are deemed trial-ready; and it is further

ORDERED that the Clerk provide a copy of this Decision and Order to the parties.

**IT IS SO ORDERED.**

May 7, 2007
Albany, New York

Gary L. Sharpe
U.S. District Judge